AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Western District of Arkansas

US DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FILED

AUG 17 2023

Ronald E. Dewing
By _____
Deputy Clerk

| In the Matter of the Search of | | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* Facebook User ID: 100041886461427 listed in "Attachment A" | ) ) ) ) ) | Case No. 5:23-cm-35 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
SEE ATTACHMENT "A," This court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3) (A) and Federal Rule of Criminal Procedure 41

located in the _____Western_____ District of _____Arkansas_____ , there is now concealed *(identify the person or describe the property to be seized)*:
SEE ATTACHMENT "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C 875(C) | Interstate Communications |
| 18 U.S.C. 922(g) | Unlawful Firearms Possession |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Eli Hobbs, FBI TFO
*Printed name and title*

Sworn to before me and signed in my presence.

Date: August 17 2023 @ 1:35pm

City and state: Fayetteville, Arkansas

*Judge's signature*

U.S. Magistrate Christy Comstock
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK ACCOUNT **100041886461427** THAT IS IN THE POSSESSION OF THE FEDERAL BUREAU OF INVESTIGATION | Case No. _____ <br><br> **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Eli Hobbs, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant to review, search, and, seize certain information produced by Meta Platforms, Inc. ("Meta") associated with Facebook account number 100041886461427 pursuant to a previous search warrant. On July 13, 2023, Federal Magistrate Honorable Christy Comstock approved a search warrant[1] for the information outlined in this search warrant application.  Meta provided the information past the fourteen-day deadline listed in the original search warrant.  Pursuant to the language set forth in *United States v. Nyah*, 928 F.3d 694 (8th Cir. 2019), your affiant requests that the Court issue this proposed search warrant allowing the FBI to search the information identified herein, namely the production from Meta of records pertaining to Facebook account number 100041886461427.  Said information is now in the custody of the FBI.  The probable cause supporting the search of the material produced by Meta remains the same as when the warrant was issued to Meta.

---

[1] This previous search warrant is filed with the case number 5:23CM25.  The previous search warrant and supporting documents are incorporated by reference as if set out word for word herein.

2.     I am a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI) and have been since 2022.   Simultaneously, I am a detective with the Washington County Sheriff's Office, located in Fayetteville, Arkansas, and have been employed since 2017. As part of my duties as an FBI TFO, I investigate national security matters related to weapons of mass destruction, domestic and international terrorism. I have received trainings and briefings related to investigative methods and outcomes. During my career, I have conducted numerous investigations resulting in multiple arrests and convictions for various criminal violations.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 875 (Interstate Communications) and § 922 (Firearms —Unlawful Acts have been committed by JOHN M. HADLEY.  There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

**PROBABLE CAUSE**

5.     On August 31, 2004, HADLEY entered military service through the Army as an Infantryman.  During his service he was deployed and sustained service-related injuries. HADLEY separated from the Army on May 6, 2009, Under Honorable Conditions (General) due to a pattern of misconduct.

6.     Based on my review of reports and records from the United States Department of Veteran's Affairs ("VA"), I know that after HADLEY's separation, he filed for a VA disability

rating due to service-related injuries. HADLEY was rated for disability. HADLEY contested his disability rating through a lawyer and his rating was raised to 60%. Ultimately, HADLEY contested the rating again and received 100% disability rating in 2017. HADLEY, however, claimed that he did not receive approximately $80,000 in back pay that he alleges the VA owes him.

7.      The VA began documenting all contact with HADLEY due to his increasingly disruptive behavior. From July 17, 2017, to November 28, 2022, the VA documented eleven criminal and noncriminal encounters at VAs located in Colorado Springs, CO, Salt Lake City, UT, and Fayetteville, AR.

8.      On September 9, 2020, HADLEY became the subject of a full order of protection out of Benton County which does not expire until September 9, 2030. The protection order expressly prohibits HADLEY from receiving or possessing a firearm.

9.      On April 6, 2022, the VA Crisis Line contacted HADLEY in response to a survey he completed on telephone number 479-335-7166. I have reviewed the recording of this call. Each of the three Crisis Line operators who spoke with HADLEY were located in Georgia at the time of the call. HADLEY brought up a VA Compensation and Pension employee (he could not recall her name) and stated, "personally I would like to gouge her fucking eyeballs out rip her fucking jaw off and smack her fucking skull, turn it into tapioca pudding. Maybe that would get the fucking message." After reestablishing the call, which had gotten disconnected, HADLEY restated, "This fucking bitch I really wanted to gouge her fucking eyeballs out, rip her fucking jaw off, and smack her fucking head on her desk until it turned into tapioca pudding. Cause, I'm okay with killing motherfuckers. I've done it a whole lot more for a whole lot less." HADLEY then stated, "Bitch I will fucking kill you." while referring to the compensation and pension

3

employee. HADLEY later stated in the call, "Whoever is in charge of the goddamn VA, I'm about to skull fuck him to death and his who goddamn family. Or her, I don't care. I don't really give two fucks." "I ain't got shit to go for right now. My kids are gone, my ex-wife is gone, I'm fucking living bankrupt." Hadley stated he has been to the Seattle VA, Lakewood VA, Atlanta VA, Little Rock VA, Fayetteville VA, and the Colorado Springs VA. The call operator asks if HADLEY still has a lawyer. HADLEY responded, "No! I have a fucking .40 and a 9 and a K-Bar and the ...inaudible... and will to fucking kill. That's where I'm at right now. I'm at the precipice, y'all are at the precipice. I'm okay with killing and dying. Motherfuckers paid me lots of goddamn money for it and I earned lots of fucking medals over it." HADLEY stated, "If she wants to die so fucking bad, next time she comes and picks up her fucking kids from my pizza shop I'll fucking shoot her. She wants to die so fucking bad, I'll hook her the fuck up. I don't care. It doesn't hurt me to kill people. It doesn't hurt me for a motherfucker to bleed out all over the fucking curb. I'm not the one fucking bleeding out all over the fucking curb." The call operator asked if the VA employee's children work at the pizza shop HADLEY works at. HADLEY responded, "Her fucking son does, and he just turned 18. He and her know and everyone else knows that I've been waiting for him to turn 18 because I want to knock his fucking teeth down her throat, (corrects himself) his throat, that way she can kind of get the message too. She obviously doesn't give a fuck about her self-preservation. ... Maybe when I fucking skull knock her fucking son and he learns to digest some fucking teeth. Maybe ...inaudible... I'm tired of going the right route. I'm about to approach every avenue of this motherfucker I can." HADLEY then stated, "If I have to go Burt Nemier (referring to Marvin Heemeyer) with a fucking ...inaudible... bulldozer through a fucking VA Healthcare system. I don't care. I don't. I'm fine with it." When the call operator attempted to determine what

4

HADLEY wanted, he stated, "No, that's not what I want to hear. I want to hear someone is calling you in ten minutes, and your check is in the fucking mail. Please don't kill our fucking employees. That's what I want to hear." In another recording from 4/6/2022, HADLEY told the call operator, "I have a lot of intent to hurt motherfuckers. It's a constant state of being. I am not opposed to it. I am a fan of it. I don't give a fuck." He then stated, "If I got to pistol whip motherfuckers into submission so fucking be it. I know for a fact that it works. Motherfuckers go from durka durka durka …inaudible… jihad, when you put a 9mm in their fucking knee they speak English like they just graduated Harvard."

10.     On or about October 19, 2022, Rogers Police issued a Be On The Lookout (BOLO) notice to area law enforcement noting HADLEY had threatened to "Take the officer's gun, shoot his estranged wife, Jamie Hadley, skin her, and turn her into a lamp." The BOLO noted HADLEY has training in hand-to-hand combat and has access to weapons.

11.     On November 28, 2022, HADLEY contacted the VA Crisis Line, which is recorded, from telephone number 479-335-7166. I have reviewed the recording of this call. The Crisis Line employee was located in Canandaigua, NY at the time of the call. HADLEY communicated to the call operator that he was upset with a VA compensation worker named Shevaun Holmes. HADLEY named Holmes specifically and during the call HADLEY informed the call operator that he knew Holmes' residential address. (The address HADLEY reported was accurate.) HADLEY stated he would burn down Holmes' house, killing both Holmes and Holmes' children. HADLEY stated multiple times that he was serious, and he knew where she lived.

12.     On November 28, 2022, the Federal Protection Service (FPS) was contacted in regard to the threats HADLEY made on Holmes. FPS found that HADLEY had sent a text to a

mutual friend of both HADLEY and Holmes named Phillip "King" Hendrix. The text contained a Google Earth image of Holmes personal residence and the message read "Fuck this bitch I want to burn her house down. She wants to die anyway." FPS then found HADLEY had contacted the VA Crisis Line, which is recorded, and stated he was "coming to Colorado, armed to the teeth" for all individuals in his case. VA dispatch began "pinging" HADLEY's cell phone and noted HADLEY was travelling west through Arkansas. With this information, the VA police were under the assumption HADLEY could be actively travelling to Colorado. VA police coordinated with the local law enforcement agency for Holmes' residence and had them conduct a welfare check on her along with establishing roving patrols in her area.

13.     HADLEY contacted the VA crisis line, which is recorded, on December 1, 2022, along with an unidentified individual who claimed to be HADLEY's "little brother". I have reviewed a recording of this call. During the call HADLEY stated, "Fix my shit or I will start killing people and myself. I'm at the end of my rope."

14.     On December 3, 2022, the VA crisis line contacted HADLEY on a recorded line to attempt to provide support to him. The crisis line employee was located in Crewe, VA at the time of the call. I have reviewed a recording of this call. HADLEY again mentioned Holmes and claimed he knows her address. HADLEY confirmed to the crisis line employee he was having homicidal and suicidal thoughts. HADLEY then stated that he was pulling up Holmes' address. He then interrupted the crisis line employee and stated, "Listen here bitch. I will burn her fucking house down. She lives at ..." HADLEY then stated Holmes' address. The crisis line employee transferred the call to her supervisor, located in Topeka, KS at the time of the call. HADLEY told the supervisor that he would go to the VA and use Molotov cocktails to burn vehicles to the ground, "Including the squad cars the mother fucking pigs are sitting in." The supervisor told

HADLEY she would need to send police to his location due to his comments of being homicidal and suicidal. HADLEY replied, "That's fine. Send the cops over here for their death." The supervisor continued talking to him and HADLEY demanded he receive his compensation immediately. The supervisor informed HADLEY that due to it being a weekend, he would not receive the money immediately. HADLEY responded, "Monday morning, I better have a lot of fucking money in my fucking bank account or I'm going to start Molotoving cocktails at fucking VAs in random...ok." He then stated, "The whole homegrown terrorism that y'all and the VA and the government is worried about. This is how that is brewed." The supervisor asked HADLEY if he had loaded weapons in his home. He responded "Yes. Not loaded, but yes. I have weapons and ammo." The supervisor asked HADLEY how he would bomb the VA since he indicated he was intoxicated. HADLEY stated he would drive to the VA. He stated, "I come up there and I fucking zip tie a fucking road flare to a one-pound propane bottle and drop it off in cars. Solves my problems." The supervisor asked HADLEY how he felt about the other individuals he could harm in the process. HADLEY said he did not care and that, "Y'all used to pay me lots of money to kill people. I'm okay with taking lives." The supervisor asked HADLEY if he had everything he needed to bomb the VA. HADLEY stated, "You're goddamn right. You fuckers taught me how to make anything out of anything." HADLEY later stated, "If I fucking knock out a window of a fucking patrol car that sits out front and fucking put a Molotov cocktail on the window with a road flare and a fucking one-pound propane tank worm clamped to each other, then yes that's a different fucking story. Fuck 12."

15.     On December 3, 2022, HADLEY posted a photo (shown below) to his Facebook account displaying a revolver handgun and two boxes of .38 special ammunition on the rear

bumper of a white SUV that matches the description of the white Nissan Armada SUV that HADLEY owns.



**John Hadley**
December 3 at 7:50 AM · 🌐

I cant wait to see you old friend(grandfather) i HOPE and PRAY to see you soon..
"Just getting the job done" as you raised the family





9

16.    A preservation request was sent to META PLATFORMS INC. to preserve HADLEY's associated account. Records provided by Meta for account id: 100041886461427 confirmed HADLEY was the owner of the account.

17.    On January 11, 2023, HADLEY drove to the Fayetteville, VA Hospital. He proceeded to damage a VA police vehicle, multiple VA employee vehicles, parked and then went through the hospital destroying VA property before VA police were able detain him. Due to HADLEY's previous threats to bomb the VA, the University of Arkansas Police Department was asked to dispatch a bomb K9 to conduct a sniff of his vehicle.

18.    On February 8, 2023, HADLEY arrived at the VA and caused a disturbance and further damage to VA property. He was cited by VA police and removed from the property.

19.    On February 10, 2023, HADLEY arrived at the VA and caused further damage to the property. He was cited by VA police.

20.    On February 16, 2023, HADLEY was arrested by the Rogers Police Department on charges of aggravated assault on a family or household member. The victim of the assault, Christine Meister, told officers on scene that HADLEY would leave for a week at a time to Colorado where she believed he has a storage unit filled with guns.

21.    On February 23, 2023, Shevaun Holmes was interviewed by law enforcement. Holmes stated she was made aware of HADLEY's situation from a mutual friend of hers and HADLEY's, Phillip Hendrix. Hendrix is the owner of the pizza store HADLEY and Holmes' son worked at. Holmes stated she looked into HADLEY's situation and found there was nothing she was able to do for his complaint as there was nothing wrong with his account. Holmes recalled during the interview with law enforcement that when she asked if there was anything further she could help him with, HADLEY became upset. Holmes stated she received the first messages from HADLEY which she felt threatened by on September 24, 2022. On November 29, 2022,

10

Hendrix told Holmes that HADLEY had sent a Google image of her house threatening to burn it down (see picture below) via text message. Holmes was unaware of how HADLEY obtained her address.



22.     In May of 2023 the preservation request for HADLEY's Facebook was extended. The current preservation period is effective through September 5, 2023.

23.     HADLEY's account is still active as of June 29, 2023.

24.     On or about July 13, 2023, a federal search warrant was obtained and executed on Meta, directing said entity to turn over to the Government certain information outlined in Attachment B included therein. On August 3, 2023, said information was provided by Meta to your affiant. As such, there exists probable cause to allow law enforcement to view and search the information produced by Meta.

## BACKGROUND CONCERNING FACEBOOK[2]

25.     Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com.  Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

26.     Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Each Facebook user is assigned a user identification number and can choose a username.

_____

[2] The information in this section is based on information published by Meta on its Facebook website, including, but not limited to, the following webpages: "Privacy Policy," available at https://www.facebook.com/privacy/policy; "Terms of Service," available at https://www.facebook.com/legal/terms; "Help Center," available at https://www.facebook.com/help; and "Information for Law Enforcement Authorities," available at https://www.facebook.com/safety/groups/law/guidelines/.

27.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

28.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

29.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user

and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

30.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes.  Users can "tag" other users in a photo or video, and can be tagged by others.  When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

31.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, video.  Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

32.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

33.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

34.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

35.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through

14

the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

36.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

37.     In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

38.     Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

39.     Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

40.     Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between

the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

41.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a

16

plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

42.      Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## CONCLUSION

43.      Based on the foregoing, I request that the Court issue the proposed search warrant to allow your affiant and other law enforcement personal to view, process, and analyze the information provided by Meta in the instant matter pursuant to a previously authorized search warrant.

## REQUEST FOR SEALING

44.      I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Eli Hobbs
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to before me on ___August 17,_____, 2023.

CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE

17

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with Facebook account identified by John Hadley (ID: 100041886461427; Vanity Name: john.hadley.547) which was produced by Meta on August 3, 2023 and is now in the possession of the FBI.

## ATTACHMENT B

### Particular Things to be Seized

I.   **Information disclosed by Meta Platforms, Inc. ("Meta") pursuant to a previous warrant, and the return of such to be searched**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)   All contact and personal identifying information, including all records or other information regarding the identification of the Account, to include full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(b)   For the time period April 6, 2022 to Present: All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)   For the time period April 6, 2022 to Present: All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)   All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including

the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)   All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, advertising ID, and user agent string;

(f)   For the time period April 6, 2022 to Present: All other records and contents of communications and messages made or received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)   All "check ins" and other location information;

(h)   All IP logs, including all records of the IP addresses that logged into the account;

(i)   All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)   All information about the Facebook pages that the account is or was a "fan" of;

(k)   All past and present lists of friends created by the account;

(l)   For the time period April 6, 2022 to Present: All records of Facebook searches performed by the account;

(m)   All information about the user's access and use of Facebook Marketplace;

(n)   The types of service utilized by the user;

2

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     Records of any Facebook accounts that are linked to the account by machine cookies (meaning all Facebook user IDs that logged into Facebook by the same machine as the account); and

(r)     All records pertaining to communications between Meta and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

3

## II.      Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 111 (Assaulting, resisting, or impeding certain officers or employees), § 115 (Influencing, impeding, or retaliating against a Federal official by threatening or injuring a family member), § 875 (Interstate Communication), § 922 (Firearms — Unlawful Acts), § 2261A (Stalking), & § 2332a (Threats of WMD) involving John HADLEY since April 6, 2022, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a)    Threats of bombing federal buildings, threats of harming government employees and their families, threats to law enforcement, possession of firearms, and preparatory steps taken in furtherance of the scheme;

(b)    Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c)    Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d)    The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in

4

addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.